## Case No. 5,044.

The FRANCIS WRIGHT.

[7 Ben. 88.] [1]

District Court, S. D. New York. Jan., 1874.[2]

Benedict, Taft & Benedict, for libellants.
C. Donohue and T. B. Stillman, for claimants.

BLATCHFORD, District Judge. On the 13th of September, 1872, the libellants, Duncan & Poey, entered into a written charter party with Woodhouse & Rudd, owners of the steamer Francis Wright, then at New York, whereby Woodhouse & Rudd charter the steamer to the libellants "for the term of six months, to run between Philadelphia or New York and Galveston, or any intermediate safe port in the United States, or any foreign port not prohibited by the insurance," with the agreement that the libellants are to have the privilege of cancelling the charter at the expiration of three months, on giving Woodhouse & Rudd fifteen days' notice and the payment of $1,500 bonus. The instrument then sets forth the following agreements by Woodhouse & Rudd: (1) That "the said vessel, in and during the said voyage, shall be kept tight, staunch, well-fitted, tackled, and provided with every requisite for such a voyage;" (2) that "the whole of the said vessel (with the exception of the necessary room for the sails, cables) shall be at the sole use and disposal of" the libellants "during the voyage aforesaid;" (3) that Woodhouse & Rudd will "take and receive on board the said vessel, during the aforesaid voyage, all such lawful goods and merchandise as" the libellants "may think proper to ship." The instrument then sets forth the following agreements by the libellants: (1) "To man, coal, and victual steamer, and pay all expenses of every nature (including port charges, etc.) connected with running of the steamer, except insurance on vessel and repairs;" (2) to pay to Woodhouse & Rudd, for the charter of the vessel, "eighty-five dollars per day, United States currency, due daily, but payable at the ex-

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

[2] [Affirmed. See note at end of case.]

piration of each and every month, in New York—vessel to be returned to the owners, at the expiration of this charter, in the same order and condition as she is now in, less the ordinary wear, and charterers to take and deliver the steamer at New York." Then follow these provisions: "Owners to nominate, and charterers to appoint, chief engineer, to be paid by charterers at rate of one hundred and twenty-five dollars per month. Charterers to appoint captain, subject to the approval of the owners. It is also agreed that this charter shall commence at New York on the 18th of September, 1872. If, from any derangement of machinery, steamer is delayed, the time lost is not to be paid for by charterers, and in case of such derangement (if any), owners to have privilege of cancelling charter. In case of any wreckage, towage or salvage accruing to the vessel whilst under this charter, one-half of said earning to be paid to the owners of the steamer."

In accordance with the terms of the charter party, John A. Sherman was appointed chief engineer of the vessel, and Henry Denison was appointed her captain. She was taken to Philadelphia, and there the libellants fitted her with a refrigerating apparatus, to bring a cargo of fresh beef from Galveston, Texas, to Philadelphia. They put on board of her at Philadelphia a general cargo of merchandise, and proper fuel, and about 260 tons of ice, the latter to be used in connection with the refrigerating apparatus, to preserve the fresh beef on the homeward voyage. She left Philadelphia for Galveston on the 3d of October, 1872, and arrived at Galveston on the 17th of the same month.

The libel alleges, that, during the voyage from Philadelphia to Galveston, the vessel gave evidence of unseaworthiness, by having a number of her boiler tubes blown out, and by great and unusual leaking in her boiler tubes, which rendered it difficult to make steam on the vessel, by reason of the water from the blown out and leaking tubes escaping into the furnaces, and affecting and diminishing the fires therein, by reason whereof the steamer was unable to attain her usual and proper speed, and was 14 days in making the passage from Philadelphia to Galveston, instead of ten days, which is the full, usual and ordinary time for a steamer of that capacity to make such voyage; that, when the vessel arrived at Galveston, Woodhouse & Rudd, through their agent and representative, the chief engineer of the vessel, were requested to make the proper and necessary repairs to the boiler and its tubes, in order that there might be no further delays after the cargo of fresh beef was laden on board, and that the vessel might make the return passage in 10 days; that the chief engineer promised that all necessary and proper repairs to the boiler and its tubes should be made, but they were not made, by reason

whereof the steamer, having on board about seventy tons of fresh beef, was, on the 31st of October, 1872, being then four hours at sea out of Galveston, on her voyage to Philadelphia, compelled to put back to Galveston for repairs, by reason of the tubes of the boiler again blowing out and leaking badly, and was detained at Galveston seven days thereafter in repairing some of the tubes; that the steamer again left Galveston, for Philadelphia, on the 7th of November, 1872, and was 15 days making the voyage, owing to the unseaworthy condition of the steamer, some of the tubes blowing out and others of them leaking so badly that the boiler could with difficulty make steam, and thereby the speed of the vessel was greatly reduced below what her ordinary speed would have been if her boiler tubes had been kept in a proper and seaworthy condition; that, by reason of the detention of the steamer at Galveston, while making repairs, and by reason of the detention of the steamer in making her passage from Galveston to Philadelphia, owing to the unseaworthy condition of the boiler tubes, and by reason of the hot water which escaped from the defective boiler tubes, and was negligently allowed to run into the bilge of the steamer and melt the ice in the refrigerator, where the fresh beef was stowed, the beef became damaged, spoiled and entirely lost to the libellants; that Woodhouse & Rudd did not perform their covenant, that the vessel, in and during said voyage, should be kept by them tight, staunch, well-fitted, tackled and provided with every requisite for such a voyage; that the value of the fresh beef at Philadelphia was $23,000; that, by reason of the failure of Woodhouse & Rudd and the vessel to comply with said covenant, the fresh beef has been wholly lost to the libellants; and that, at the time of the making of the charter party, Woodhouse & Rudd knew that the steamer was chartered by the libellants for the purpose of carrying fresh beef from Galveston to Philadelphia, and also knew that the steamer was in an unseaworthy condition as regards her boiler and its tubes. The libel claims $30,000 damages against the vessel and her owners.

The answer of Woodhouse & Rudd, as claimants, sets up that the libellants had the entire charge and possession of the vessel, and denies that the chief engineer was the agent or representative of the claimants, and avers that the repairs which the claimants were bound to make were made, and that the steamer was, so far as the claimants were bound to do so, kept as called for by the charter party, and denies all the allegations of the libel on which the libellants claim a recovery.

It may not be difficult to hold, that, under the charter party, the claimants were bound to keep the boiler and its tubes in proper condition during the voyage, through the master and the chief engineer, as their agents; that the claimants remained in pos-

session of the vessel for such purpose, through those officers, as their agents for such purpose; that the boiler and its tubes were not kept in proper condition; and that, from that cause, the voyage was delayed and prolonged.

By the charter party, the claimants agree to keep the vessel, while on a voyage named in the charter party, well-fitted and provided with every requisite for such a voyage; and it is agreed that the libellants shall not pay any expenses of repairs. To enable the claimants to discharge such duty, it is provided that they shall have the nomination of the person who is to be chief engineer, and that no appointment of a captain shall be made otherwise than subject to their approval. The chief engineer was nominated by them, and the captain was appointed with their approval. The claimants assumed absolutely the obligation referred to. They either deprived themselves voluntarily of all means of fulfilling it, by not having any agent on board to attend to its fulfillment, or the officers referred to must be regarded as being in the interest of the claimants, through their mode of appointment, for the purpose of seeing to the fulfillment of such obligations.

The claimants contend that the libellants were in the exclusive possession of the vessel. But the provisions that the vessel shall be at the sole use and disposal of the libellants, and that the libellants shall man, coal, and victual her, and pay her running expenses (except insurance and repairs), and return her at the expiration of the charter in proper condition, less ordinary wear, and take and deliver her at New-York, and pay one-half of her salvage earnings to the claimants, are not at all inconsistent with a fulfillment by the claimants of the agreed duty of keeping the vessel well fitted and provided with every requisite for the voyage, or with such possession by the claimants, through the captain and chief engineer, appointed in the manner prescribed, as would enable the claimants, through those officers to represent them in that regard, to see that the agreement was performed.

That the boiler and its tubes were not kept in proper condition during the voyage is established by the evidence. The boiler was not seaworthy. Whatever its apparent condition was when the vessel left Galveston the first time, with her cargo of beef on board, subsequent events and the result show that the boiler was unseaworthy. There was no cause to produce the blowing out and leaking of the tubes, but the inherent defects of the boiler. Having left Galveston on the 31st of October, at eleven o'clock a. m., the vessel was stopped at seven p. m., because 26 out of the 144 tubes in her boiler were leaking. She lay until ten a. m. on the 1st of November, making repairs, and then returned to Galveston, and remained there making further repairs till seven a. m.

on the 7th of November, thus losing full seven days of time. The return to Galveston was necessary in order to obtain a proper tool with which to make the repairs. On the voyage from Philadelphia to Galveston the vessel was stopped at sea, on the 8th of October, for five and a half hours, to make repairs on the boiler and engine, and on the 12th for two and a half hours, to plug leaking tubes, and on the 17th for two hours, for repairs to the boiler. This indicated a condition of things which required that the boiler should be thoroughly repaired before starting on the return voyage. But the repairs made were not thorough, as shown by the result. The return to Galveston was the result of the co-operating judgment of the captain and the chief engineer, that such return was necessary. On the return voyage the vessel put into Key West, arriving there at three p. m. on the 14th of November. During the passage to Key West the boiler leaked, though there was no stoppage. The vessel left Key West on the 15th, at 2.30 p. m. On the 16th and 17th the boiler leaked. On the 18th the vessel stopped for seven and three-quarter hours, and stopped up three tubes, and on the 21st she stopped for four and a half hours, and stopped up one tube and repaired three others. She arrived at Delaware City, three and a half hours below Philadelphia, at noon on November 22d, with twenty-six of her tubes plugged up.

The quarters of beef were on slatted racks in a refrigerating room in the hold of the vessel. In such room was a box, standing on the floor, about four feet square and eight or nine feet high. This box was replenished with ice from time to time. By machinery outside of the room, the air of the room was driven through the box, and into contact with the ice, and out again into the room, constantly circulating. There was no opening into the room except by a hole in the top, and there was an opening into the box from the outside of the room, to replenish the box with ice, from the general depository of ice elsewhere.

The difficult question in the case is, as to whether it is satisfactorily shown that the beef was spoiled and lost through the causes set forth in the libel. The burden of proof is on the libellants, to show this. The averment of the libel is, that, by reason of the detention of the steamer at Galveston, while making repairs, and by reason of the detention of the steamer in making her passage from Galveston to Philadelphia, owing to the unseaworthy condition of the boiler tubes, and by reason of the hot water which escaped from the defective boiler tubes and was negligently allowed to run into the bilge of the steamer and melt the ice in the refrigerator where the fresh beef was stowed, the beef became damaged, spoiled and entirely lost to the libellants. It is not enough to show the unseaworthy condition of the boiler tubes, and that the vessel was de-

tained at Galveston to repair them, and was detained on her passage by reason of them and to repair them, and that hot water escaped and ran into the bilge, and some ice was melted from such cause. It must be shown that, but for such things, the beef would have been and was unspoiled, and merchantable as fresh beef.

Zane, the person who came in the vessel, from Galveston, in charge of the beef, testifies, that, when the vessel left Galveston the first time, the temperature of the room was 39° Fahrenheit; that, while they were stopped at sea, outside of Galveston, it rose to 46°; that, when they returned to Galveston, it was 44°; that the day before they arrived at Key West it was about 50°; that they had about 100 tons of ice when they left Galveston the first time, and about 95 tons when they left there the second time; that they had about fifteen tons left when they reached Key West; that they procured twenty tons more at Key West; that the first day out from Key West (November 16th), the temperature of the refrigerating room was about as usual, say 40°; that the next day it became 60°, and afterwards increased to 68°, when they were about at Cape Hatteras; that then the beef spoiled, and part of it was thrown overboard; and that, at that time, the ice was not quite all used up.

The libellants contend that the beef remained unspoiled until after the vessel had left Key West for Philadelphia, and that the cargo would have been landed in good merchantable order at Philadelphia before the time it, in fact, spoiled, but for the detentions specified in the libel, because, but for such detentions, it would have been at Philadelphia, unspoiled, at a time when it was at sea, unspoiled.

No complaint is made as to any loss of time by putting in at Key West. From the time the vessel left Galveston the second time (November 7th, at 7 a. m.), till she substantially reached Philadelphia (November 22d, at 3½ p. m.), was 15 days and 8½ hours. Leaving Galveston October 31st, at 11 a. m., a trip of 15 days and 8½ hours would have brought her to Philadelphia November 15th, at 7½ p. m., at which time she was at sea, having left Key West 5 hours before.

Was the beef unspoiled and merchantable at the time the vessel left Key West? Captain Denison, on his direct examination, testifies, that he saw the cook cutting some of the beef and cooking it, and the men eating it, on the Monday after leaving Key West (which Monday was November 18th); that it was on the cabin table, and eaten by some, after leaving Key West; and that it cut as if it was good. On his cross-examination, this is his evidence: "Q. Did not you, yourself, at that time, at Key West, after the attempt was made to get the beef, say it was stinking? A. I do not remember that I did. Q. Will you swear you did not? A. I will not. Q. Will you swear it was not stinking? A.

I will not swear. Q. Was it not, in fact, beginning to taint? A. That is a hard question for me to answer, because I did not know the condition of it then. Q. You have been swearing to something about its condition; I ask whether it was not beginning to taint? A. I had my suspicions about it. Q. Were not you suspicious that it was beginning to taint? A. I was told it was not. Q. Did you not know that that beef was beginning to taint at that time? A. I would not swear it was good, nor would I swear it was bad. Q. You were one of the persons interested in the beef? A. I was very anxious to get it here safe. Q. Did you not state, in Key West, at that time, that it was beginning to taint, or was tainted? A. I might have said so, but I do not remember. Q. Did you not say to Mr. Sherman, your chief engineer, that the beef stank, at Key West? A. I may have said so, but I do not remember that I did; I will not swear I did not, because I said a great deal about the beef being bad. Q. Did you not say, at Key West, that it was 'all up'? A. Not that I remember. Q. You will not swear you did not? A. I will not swear I did not. Q. Did you not say, in Key West, that you were very much worried about buying the ice, as you thought it was so much money thrown away? A. I said, in Key West, that I would not buy the ice, if the party in charge did not give me a written order to buy it. Q. Did you not say it was so much money thrown away? A. I may have said I feared it; ice was so very high there, that I hated to buy it, and I thought we had enough, when we left Galveston, to see us home."

Zane, on his direct examination, says, that the beef was in good order when they arrived at Key West; that he is sure it was good the Tuesday morning after leaving Key West (which Tuesday was November 19th); that he knows it was good then because he ate of it and saw others eat of it; that he examined it himself; and that he detected indications of its spoiling the next day. On cross-examination, he says that he gave some of the beef to one of the government vessels at Key West, and it was good.

The evidence shows that this was an experimental voyage, to see whether the refrigerating apparatus and machinery would work successfully. There were 15 tons of ice left on arriving at Key West. The consumption of ice from Galveston to Key West, in 7 days and 8 hours, had been 80 tons. The running time of the vessel from Key West to Philadelphia, was 6 days and 12¾ hours, after deducting the stoppages, yet the vessel did not have over 35 tons of ice (including the 20 purchased at Key West), for use during that time. The same rate of use as from Galveston to Key West, would have required over 71 tons for the voyage from Key West to Philadelphia, instead of 35 tons. If the beef was good at Key West, these facts would tend to show that its subsequent spoiling

was due to a want of sufficient ice, or, if there was ice enough, to the inability of the apparatus to preserve the beef. Notwithstanding the delay, the libellants were bound to use all accessible means to preserve the beef. If ice was needed and could be procured, it should have been procured at Key West, and such additional expense, and not the loss of the beef, have been thrown on the claimants. It does not appear that more ice could not have been obtained at Key West. The impression produced by the evidence is that, as the ice was giving out, the beef began to spoil, and that it spoiled because the ice gave out. The first day out from Key West, the temperature of the refrigerating room was about 40°, the usual, and, as I understand from the testimony, the proper temperature. The fact that so small a supply of ice was procured at Key West, and that there was such reluctance on the part of the captain to procure what he did, looks in the direction, very strongly, of a spoiled condition in the beef, at Key West, or such a condition as made it substantially unmerchantable when it reached Key West. This is confirmed by the halting testimony of the captain. If true, then the delay before the vessel reached Key West was not the reason why the beef did not reach Philadelphia in merchantable condition, because, the delay before reaching Key West was only seven days, and the running time from Key West to Philadelphia added to the time the vessel remained at Key West was 7 days and 12¼ hours. If the beef was good at Key West, and spoiled afterwards for want of ice, the claimants are not shown to be responsible for the loss. If there was plenty of ice after leaving Key West, and yet the beef spoiled, it would indicate inability in the apparatus to prevent the spoiling, and for this it is not shown that the claimants are liable.

As to any melting of ice by hot water in the bilge, any effect therefrom to spoil the beef is covered by the views before stated. But I am not satisfied, from the evidence, that any hot water in the bilge, from the leaking tubes, had any effect to raise the temperature of the refrigerating room, or to melt any ice

On a full consideration of the whole case, I can come to no other conclusion than that the libellants have not made out the cause of action set forth in the libel, and that it must be dismissed, with costs.

After the rendering of the above decision, the libellants applied for a new hearing, on further evidence, alleging that they had evidence to show that the beef was not spoiled for lack of ice, or for any deficiency in the apparatus, which they could have offered, if they had supposed the case was to turn on that question.

BLATCHFORD, District Judge. I have announced a decision, in this case, that the libel must be dismissed, with costs. No decree has been entered. The libellants apply for a rehearing of the case on further testimony. They state that they desire to present evidence on a point on which they say the decision turned, and that such point was not fully inquired into on the trial, and that material evidence was omitted. It is not claimed that there is any newly discovered evidence, but it is said that evidence which could have been given was not given. The case is presented as merely one of oversight, and I do not think that a retrial in such a case, in an admiralty suit, ought to be allowed. The Vrouw Hermina, 1 C. Rob. Adm. 163, 170; The Fortitudo, 2 Dod. 58, 70. An appeal will give a retrial in the circuit court, and on that the omitted evidence can be adduced. The claimants have been subjected to one trial in this court, and I think they have a right, on the facts presented, to require that the omitted evidence shall be presented, if at all, only on an appeal. The application is refused.